UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

EUNICE COOK WEBB, M.D.                    CIVIL ACTION NO. 09-615

VERSUS                                    JUDGE S. MAURICE HICKS, JR.

RODNEY ARBUCKLE, ET AL.                   MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court is Motion for Summary Judgment (Record Document 29) filed by Defendants Rodney Arbuckle, Sheriff of DeSoto Parish ("Sheriff Arbuckle"), Corporal Rick Pharris ("Corporal Pharris"), and Sergeant Stephanie White ("Sergeant White"). Sheriff Arbuckle, Corporal Pharris, and Sergeant White seek dismissal of all of Plaintiff Eunice Cook Webb, M.D.'s ("Dr. Webb") claims. See id. Dr. Webb opposed the motion. See Record Document 34. For the reasons which follow, the Motion for Summary Judgment is **GRANTED**.

**BACKGROUND**

The Tri- Parish Task Force was formed to enforce drug laws in the tri-parish area, which includes Sabine, Red River, and DeSoto Parishes. On April 25, 2008, officers with the Desoto Parish Sheriff's Office and other area law enforcement agencies, as part of the Tri-Parish Task Force, conducted a "sign detail" operation at I-49 and Asseff Road.

The "sign detail" operation included the use of a sign on the northbound shoulder of I-49 announcing a non-existent, ruse drug checkpoint ahead.[1] The sign was placed a few hundred feet south of the Asseff Road exit and read "Narcotics Checkpoint ½ Mile

---

[1]Dr. Webb refers to the "sign detail" operation as a checkpoint. See Record Document 34-1 at ¶ 2. Defendants state that "in actuality, there was no checkpoint." Record Document 29-2 at ¶ 1.

Ahead Caution K-9 on Duty." Record Document 29-4 at 2. Asseff Road at I-49 is a gravel road in both directions with no services such as gas stations, hotels, or restaurants. Vehicles exiting I-49 at Asseff Road were observed by an officer acting as a spotter to determine if there were traffic violations or other violations of law as the vehicle was exiting. If violations were observed, then officers stopped the vehicle for the violation and questioned the driver. Part of this questioning was to determine whether there was reasonable suspicion or probable cause of other, possibly drug related, violations. Vehicles which exited at Asseff Road but did not commit observable traffic violations or other violations of law were not stopped. They were allowed to proceed without interference. The "sign detail" operation also utilized a command center trailer which was parked underneath the I-49/Asseff Road overpass.

On April 25, 2008, Dr. Webb was returning home from work in the emergency room at the Natchitoches Parish Hospital to her residence in Longview, Texas. See Record Document 1 at ¶ 14. Her vehicle was stopped as part of the "sign detail" operation because she failed to use a turn signal when turning from I-49 onto the Asseff Road exit just after passing the sign announcing the nonexistent drug check point.[2] Additionally, Agent Lisa Garcia ("Agent Garcia") of the Louisiana Department of Public Safety and Corrections, Division of Probation and Parole, testified that she observed Dr. Webb fail to stop at the stop sign at the end of the exit ramp. The primary officers involved in the traffic stop were

---

[2]As discussed more fully *infra*, Dr. Webb contends that Louisiana law does not require a motorist to signal an exit from an interstate highway. See Record Document 34-1 at ¶ 3.

by Corporal Pharris, Sergeant White, and Agent Garcia.[3]

Sergeant White asked Dr. Webb for her license and registration and began the process of citing her for a traffic violation. Corporal Pharris began to ask Dr. Webb questions about where she was going and why she exited I-49. During the stop, Dr. Webb[4] admitted to the officers that she may have a bag in her vehicle[5] that had some medications in it. She also admitted that she did not have a prescription for these medications, some of which may be controlled dangerous substances such as Lortab. Dr. Webb indicated that these drugs were for use during house calls. The officers further reported that in discussing the drugs in her bag, Dr. Webb became extremely nervous, anxious and nonsensical in her statements and demeanor. Dr. Webb concedes that she became extremely nervous and anxious about the ordeal.[6]

Sergeant White radioed Corporal Jayson Richardson ("Corporal Richardson"), the officer in the trailer/command center, and asked if he had any knowledge concerning whether or not doctors were permitted to carry controlled substances without prescriptions. Corporal Richardson informed Sergeant White that he had never known that to be the case

---

[3]Agent Garcia has filed a Motion for Summary Judgment on the grounds of qualified immunity. See Record Document 23. The Court will issue a separate ruling on that motion.

[4]Dr. Webb is the holder of a Drug Enforcement Administration ("DEA") license.

[5]Both Sergeant White and Corporal Pharris have stated that there were multiple bags in the backseat of Dr. Webb's vehicle. See Record Document 29, Exhibits 3 and 4.

[6]Dr. Webb notes that she produced her Texas medical license to Corporal Pharris during the traffic stop. See Record Document 34 at 6. Defendants do not argue that they had any reason to disbelieve that Dr. Webb was in fact a licensed physician. However, while Dr. Webb discussed her "narcotics license," which is issued by the Drug Enforcement Administration, during her deposition, there is no factual allegation that she produced this license during the traffic stop.

and in his opinion if Dr. Webb had admitted to possessing prescription medications without a prescription, then there was probable cause to search the vehicle.

Corporal Pharris sought consent to search Dr. Webb's vehicle. Dr. Webb did not consent. Corporal Pharris then directed Dr. Webb to exit her vehicle.[7] Corporal Pharris, Agent Garcia, and Corporal Mike Hughes, the K-9 officer at the "sign detail" operation, searched Dr. Webb's vehicle and bags. Drugs, namely vials of liquid injectables which Dr. Webb indicated to be either Demerol or morphine, were found in Dr. Webb's bag. Dr. Webb was ultimately cited for failure to use her signal, but was not charged with any drug related offense. Dr. Webb believes that she was detained for approximately one hour. Conversely, while the exact duration of the stop is unclear, the officers contend that the traffic stop lasted between 12 and 30 minutes.

## LAW AND ANALYSIS

### I.  Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] Quality Infusion Care, Inc. v. Health Care Serv. Corp., — F.3d —, No. 09-20188, 2010 WL 5188825, at *2 (5th Cir. Dec. 23, 2010). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and

---

[7]In his report, Corporal Pharris stated that after Dr. Webb exited her vehicle, she stated that he could look in her vehicle if she could watch. See Record Document 29, Exhibit 4. However, for purposes of the instant Memorandum Ruling, the Court will assume that Dr. Webb did not consent to a search of her vehicle.

[8]The Court notes that the newly amended Rule 56 requires that there be "no genuine *dispute* as to any material fact," but this change does not alter the Court's analysis. F.R.C.P. 56(a) and advisory committee's note (emphasis added).

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

## II.    Sign Detail Operation.

Dr. Webb contends that the sign detail operation, i.e., the ruse drug checkpoint, violates the Fourth Amendment. She seeks a preliminary and permanent injunction "enjoining and restraining [Sheriff] Arbuckle and all others acting pursuant to his knowledge, consent and encouragement from utilizing the mandatory drug check ruse." Record Document 1 at ¶ 54. She further seeks "a declaratory judgment declaring that the [ruse] drug checkpoint employed by the defendants herein on April 25, 2008, and which the defendants have declared their intention to continue to employ, violates the Fourth Amendment to the United States Constitution." Dr. Webb has two basic arguments: (1) the "sign detail" operation is unconstitutional because the United States Supreme Court held in City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447 (2000), that drug interdiction checkpoints violated the Fourth Amendment; and (2) the "sign detail" operation is unconstitutional because it is conducted without formal rules or objective standards to circumscribe the discretion of the officers.

Dr. Webb's general reliance upon Edmond is misplaced, as that case addressed the constitutionality of an actual drug interdiction checkpoint and the suspicionless stop of vehicles. See U.S. v. Martinez, 358 F.3d 1005, 1008 -1009 (8th Cir. 2004) ("While the present case is factually similar to Edmond . . ., a critical distinction remains: Edmond . . . involved the use of actual checkpoints at which motorists were stopped regardless of whether they had committed a traffic violation. Here, there was no checkpoint on the Sugar Tree Road exit, and motorists who took the exit were not stopped unless they were observed committing a traffic violation. Given this distinction, Edmond . . . [is] not controlling."). Dr. Webb never reached an actual drug checkpoint in this case; rather, she simply encountered a ruse established by the police, i.e., the sign warning of the fictitious narcotics checkpoint. See U.S. v. Flynn, 309 F.3d 736 (10th Cir. 2002); U.S. v. Carr, No. 09-40071-02, 2010 WL 1424362, *3 ("Trooper Smith developed a reasonable articulable suspicion of individualized criminal activity before he stopped defendants. More importantly, unlike the facts in the cases cited by defendant, there was no checkpoint in this case. Police officers erected signs for a checkpoint, but not a single driver was stopped as part of an actual checkpoint investigation. Thus, defendant's references to case law applying the Fourth Amendment to police checkpoints is inapposite."). Moreover, the summary judgment record establishes that the "sign detail" operation in this case did not involve the suspicionless stop of vehicles. Rather, the officers stopped the vehicles only if a traffic violation or other violation of law was observed, thus employing the highest level of individualized reasonable suspicion – probable cause.[9] See U.S. v. Jones, 185 F.3d 459,

---

[9]In their Statement of Uncontested Facts, Defendants stated:

463-464 (5th Cir. 1999) (stating that observation of traffic violation creates sufficient probable cause to support a traffic stop); Whren v. U.S., 517 U.S. 806, 810, 116 S.Ct. 1769, 1772 (1996) (holding "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). This distinction is key because it also discredits Dr. Webb's second argument that the "sign detail" operation was conducted without formal rules or objective standards to circumscribe the discretion of the officers. In fact, the "sign detail" operation at issue was conducted under the objective standard of probable cause, as vehicles were stopped only if the officer acting as a spotter observed a traffic violation or other violation of law as the vehicle was exiting at Asseff Road.

Based on the foregoing analysis, the Court finds that the April 25, 2008 "sign detail" operation, which was premised on a ruse narcotics checkpoint, was constitutionally valid. Defendant's Motion for Summary Judgment on this issue is, therefore, **GRANTED**.

### III.     Fourth Amendment Claims and Qualified Immunity.

---

2. Vehicles exiting I-49 at Asseff Road were observed by an officer acting as a spotter to determine if there were traffic violations or other law violations as the vehicle was exiting. If violations were observed, then officers stopped the vehicle for the violation and questioned the driver. Part of this questioning was to determine whether or not there was reasonable suspicion or probable cause of other, possibly drug related, violations.

3. Vehicles which exited at Asseff Road but did not commit observable violations were not stopped, but were allowed to proceed without interference.

Record Document 29-2. Dr. Webb admitted the correctness of statement number 2 and disputed statement number 3 "for the reason that La. R.S. 32:104 does not require a motorist to signal an exit from an interstate highway." Record Document 34-1.

In addition to attacking the constitutional validity of the "sign detail" operation, Dr. Webb alleges that the initial traffic stop, the prolonged detention, and the search of her vehicle violated her rights under the Fourth Amendment. Defendants contend that the traffic stop, the detention, and the search were all constitutional. Additionally, the officers argue they are entitled to qualified immunity.

Initial Traffic Stop

The Fourth Amendment protects individuals from unreasonable searches and seizures. Traffic stops are considered seizures within the meaning of the Fourth Amendment. See U.S. v. Banuelos-Romero, 597 F.3d 763, 766 (5th Cir. 2010). The legality of seizures/traffic stops for Fourth Amendment purposes is analyzed under the standard articulated by the Supreme Court in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968). Under the two-part Terry inquiry, the Court first examines whether or not the officer's decision to stop the vehicle was justified at its inception. See U.S. v. Pack, — F.3d —, No. 08-41063, 2010 WL 2777061, 6 (5th Cir. July 15, 2010); U.S. v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004). Second, the Court determines whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. See id.

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity occurred, or is about to occur, before stopping the vehicle. See Banuelos-Romero, 597 F.3d at 766. Here, both Corporal Pharris and Corporal White stated in their affidavits that the officer acting as the spotter informed them over the radio that Dr. Webb turned from I-49 onto the Asself Road exit without using

her turn signal. See Record Document 29, Exhibits 3 and 4.[10] Dr. Webb does not contest this fact, but rather admitted the correctness of the following statement:

> Dr. Webb's vehicle was stopped because she failed to use a turn signal when turning from I-49 onto the Asseff Road exit just after passing the sign announcing the non-existent drug check point.

Record Documents 29-2 at ¶ 5; Record Document 34-1 at ¶ 1.

At most, Dr. Webb indirectly challenges the reason for the initial traffic stop, stating that she was "purportedly" stopped for failing to signal her exit from I-49. See Record Document 19-2 at ¶ 7. Under Louisiana law, "whenever a person intends to make a right or left turn which will take his vehicle from the *highway* it is then traveling, he shall give a signal of such intention in the manner described hereafter and such signal shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning." La. R.S. 32:104(B) (emphasis added).[11] Thus, the summary judgment evidence establishes that the decision to stop Dr. Webb's vehicle was justified in its inception because her vehicle was stopped for committing a traffic violation. See Jones, 185 F.3d at 463-464 (stating that observation of traffic violation creates sufficient probable cause to support a traffic stop); Whren, 517 U.S. at 810, 116 S.Ct. at 1772 (holding "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Moreover, Dr. Webb's contention that the

---

[10]Additionally, Agent Garcia testified in her deposition that she observed Dr. Webb fail to stop at the stop sign at the end of the exit ramp. See Record Document 29, Exhibit 5 at 31.

[11]Despite the plain language of Section 104(B), Dr. Webb makes the conclusory allegation that "La. R.S. 32:104 does not require a motorist to signal an exit from an interstate highway." Record Document 34-1 at ¶ 3.

Case 5:09-cv-00615-SMH-MLH   Document 38   Filed 03/18/11   Page 10 of 20 PageID #: 623

traffic stop was unconstitutional because the officers' ultimate purpose was to interdict illegal drugs fails, as the subjective motivation for the stop is irrelevant when there was an objective legal justification for the stop. See Whren, 517 U.S. at 812-13, 116 S.Ct. at 1773-1774. Thus, for the reasons set forth above, summary judgment in favor of Defendants is **GRANTED** as to Dr. Webb's allegation that the initial traffic stop violated her rights under the Fourth Amendment.

Prolonged Detention

Next, Dr. Webb argues that her prolonged detention was unconstitutional. While Defendants contend that such detention was between 12 and 30 minutes, the Court will assume that the detention could have lasted as long as one hour, as estimated by Dr. Webb. See Record Document 29, Exhibit 4; Record Document 19-2 at ¶ 9. Moreover, the Court will decide this claim on the grounds of qualified immunity.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). "Once raised, a plaintiff has the burden to rebut the qualified immunity defense. . . . We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs." Estate of Davis v. City of N. Richland Hills, 406 F.3d 375, 380 (5th Cir.2005). The qualified immunity inquiry consists of two prongs: "(1) whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's alleged misconduct." Ontiveros, 564 F.3d at 382. After Pearson v. Callahan, 555 U.S. 223, 129

S.Ct. 808 (2009)(overruling, in part, Saucier v. Katz, 533 U.S. 194, 121 S .Ct. 2151 (2001)), the court may conduct the two-part test in any sequence. See id.

There is no dispute that the Fourth Amendment right to be free from unreasonable seizures, which would include a prolonged detention following a traffic stop, was clearly established at the time of Defendants' alleged misconduct. See Banuelos-Romero, 597 F.3d at 766. Thus, the question before the Court is whether, considering the facts in the light most favorable to Dr. Webb, she has demonstrated facts sufficient to establish a violation of this Fourth Amendment right.

The Court has previously held that the initial traffic stop in this case was valid. During a valid traffic stop, "an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation." Banuelos-Romero, 597 F.3d at 766. Yet, the detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. Id. at 766-767. However, if "additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." Id. at 767. An officer has reasonable suspicion when he "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." Id. Courts must consider the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Id. However, reasonable suspicion need not rise to the level of probable cause. See id.

Sergeant White stated in her affidavit that while she was in the process of writing the

citation and waiting for information from Corporal Richardson concerning the check with law enforcement databases, she and Corporal Pharris talked with Dr. Webb and became suspicious that her vehicle may contain illegal contraband. See Record Document 29, Exhibit 3. Sergeant White described Dr. Webb's demeanor at the scene as "kind of out of it," "rambling on," "some of what she was saying didn't make a whole lot of sense," and "she wasn't answering the questions clearly." Id., Exhibit 8 at 28-29. Sergeant White specifically recalled Dr. Webb stating that she was not sure about which "meds" she had in her bag. Id. at 29. While Dr. Webb denies that she was nonsensical, she does admit that "she became extremely nervous and anxious about the ordeal she was subjected to." Record Document 34-1 at ¶ 5.

Likewise, Corporal Pharris recalled that upon initial questioning of Dr. Webb while waiting for Corporal Richardson in the mobile command center to check information on Dr. Webb and her vehicle, he and Sergeant White became suspicious that the vehicle contained contraband. See Record Document 29, Exhibit 4. This assessment was based on Dr. Webb's responses and demeanor. See id. Corporal Pharris further stated that he had worked the "sign detail" operation approximately ten times and Dr. Webb's "actions, demeanor, and communication were more nervous, anxious and suspicious than is normal for those who have been pulled over during the 'sign detail' operation." Id.

Defendants have also presented the affidavit and report of George J. Armbruster, Jr. ("Armbruster") as competent summary judgment evidence. See Record Document 29, Exhibit 12. Armbruster has been offered as a police procedures expert. See id. In connection with this case, Armbruster reviewed, among other things, pleadings, discovery, officer reports, policy manuals, photographs, case law, and depositions. See id. In his

expert opinion, Armbruster stated:

> The questioning of Dr. Webb was . . . reasonable and falls well within the generally accepted guidelines of the law enforcement community. The questioning led officers to believe that there may be some type of illegal substance in the vehicle based upon responses provided by Dr. Webb.
>
> . . .
>
> The amount of time that this incident took place over was more than normal for the issuance of a traffic citation, but based on the exchange of information and the search of the vehicle and the bags, the total amount of time was reasonable, in my opinion, based on the totality of the circumstances. The officers were faced with the knowledge that the vehicle contained what could be illegal substances based on the responses provided by Dr. Webb. This information required further investigations which was part of the total amount of time involved in this stop. The actual search of the vehicle and the items also took up time that is not part of a normal issuing of a traffic citation.

Id.

Based on the foregoing, and considering the relevant summary judgment evidence in a light most favorable to Dr. Webb, the Court finds that the officers' conduct in prolonging the detention to approximately one hour was objectively reasonable under the Fourth Amendment. See Lockett v. New Orleans City, 607 F.3d 992, 1000 (5th Cir. 2010) ("In light of these circumstances, we conclude that the one-hour detention was not unreasonable."). The record establishes that the officers involved had an objective basis for suspecting legal wrongdoing. The officers knew that Dr. Webb had taken the first rural exit, which was a gravel road with no gas stations, hotels, or restaurants, immediately after the "Narcotics Checkpoint" sign. Additionally, during the process of writing the citation and while waiting for information from Corporal Richardson concerning the law enforcement database check, the officers developed a reasonable suspicion that Dr. Webb's vehicle contained contraband. Much of this suspicion was based on Dr. Webb's demeanor, which she admits

was nervous and anxious. She also informed the officers that she likely had controlled substances in her vehicle for which she did not have prescriptions.

Based on this undisputed summary judgment evidence, the officers were objectively reasonable in believing they could continue Dr. Webb's detention until they dispelled or confirmed their suspicion of legal wrongdoing. In fact, the officers' attempts to dispel or confirm their reasonable suspicion appears to be what lengthened the detention in this case. There was an expansive amount of information exchanged between Dr. Webb and Corporal Pharris. See Record Document 29, Exhibit 4 (Corporal Pharris Affidavit and Report) and Exhibit 12 (Armbruster Affidavit and Report). For instance, Dr. Webb produced her Texas medical license to Corporal Pharris during the traffic stop. However, there is no summary judgment evidence to indicate that she produced her "narcotics license."[12] Thus, in addition to the routine law enforcement database check, Sergeant White radioed Corporal Richardson to see if he could provide any additional guidance as to whether doctors were permitted to carry controlled substances without prescriptions. The officers ultimately searched Dr. Webb's vehicle. In light of these circumstances, the Court finds

---

[12]Dr. Webb explained in her deposition that she has a "narcotics license." Record Document 34 at 6. This license was issued by the Drug Enforcement Administration. See id. "Under the Controlled Substances Act, Dr. Webb is termed a practitioner who is licensed by the United States to distribute, use and possess in the course of her professional practice or research, controlled substances. 21 U.S.C.A. § 802(21)." Id. The parties did not address and the summary judgment record is unclear as to whether Dr. Webb was under any duty to carry her "narcotics license" while in possession of narcotics, such as the vials of liquid injectables found in her vehicle. Notwithstanding, it appears that she was in lawful possession of the controlled substances by virtue of her "narcotics license" and under the Controlled Substances Act. However, this statutory information was not readily available to the officers at the "sign detail" operation. While Dr. Webb produced her Texas medical license, there is no factual evidence indicating that she produced or even discussed her "narcotics license" with the officers on the scene of the "sign detail" operation.

that the one-hour detention of Dr. Webb was not unreasonable.  Defendants are entitled to qualified immunity and summary judgment is, therefore, **GRANTED** in their favor as to Dr. Webb's prolonged detention claim.

Search

The Court now turns to Dr. Webb's allegation that the search of her vehicle was unconstitutional.  Specifically, she contends that the search should have been restricted to her "doctor's bag."  Record Document 34 at 7.  This claim will also be decided on the grounds of qualified immunity.  Once again, there is no dispute that the Fourth Amendment right to be free from unreasonable searches was clearly established at the time of Defendants' alleged misconduct.  See Banuelos-Romero, 597 F.3d at 766.  Thus, under the qualified immunity analysis, the question before the Court is whether, considering the facts in the light most favorable to Dr. Webb, she has demonstrated facts sufficient to establish a violation of this Fourth Amendment right.

Law enforcement officers may conduct a warrantless search of an automobile if "(1) the officer conducting the search had 'probable cause to believe that the vehicle in question contain[ed] property that the government may properly seize'; and (2) exigent circumstances justified the search." Banuelos-Romero, 597 F.3d at 767.  In a vehicle stop on a highway, "the fact of the automobile's potential mobility" supplies the requisite exigency.[13]  Id.; see also Mack v. City of Abilene, 461 F.3d 547, 553 n. 2 (5th Cir.2006)

---

[13]Dr. Webb's vehicle was not searched on I-49.  The search was conducted after she exited I-49 at Asseff Road.  Notwithstanding, the concerns underlying the automobile exception – the ready mobility of an automobile and the lesser expectation of privacy associated with them – are still applicable in this instance.  See Mack, 461 F.3d at 553, citing U.S. v. Gallman, 907 F.2d 639, 641 (7th Cir.1990).

(discussing the automobile exception to the warrant requirement).

Probable cause to search an automobile exists when trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband. See Banuelos-Romero, 597 F.3d at 767. "Probable cause determinations are not to be made on the basis of factors considered in isolation, but rather on the totality of the circumstances." Id. Police officers are permitted to draw inferences based on their own experiences in deciding whether probable cause exists, including inferences that might well elude an untrained person. See id. at 768.

Here, the officers were objectively reasonable in their belief that they had probable cause to believe that Dr. Webb's vehicle contained contraband. Again, the officers knew that Dr. Webb had taken the first rural exit, which was a gravel road with no gas stations, hotels, or restaurants, immediately after the "Narcotics Checkpoint" sign. Dr. Webb admitted that she had drugs in her medical bag. Yet, she did not know the specific type of drugs, other than to say they were probably controlled dangerous substances, for which she had no prescription. Sergeant White even radioed Corporal Richardson for additional guidance on the issue of whether doctors had to have prescriptions for controlled dangerous substances. Corporal Richardson advised Sergeant White that in his opinion if Dr. Webb had admitted to possessing prescription medications without a prescription, then there was probable cause to search the vehicle.

As to the argument that only Dr. Webb's medical bag should have been searched, the Court notes that both Sergeant White and Corporal Pharris testified about there being multiple bags carrying medical equipment in Dr. Webb's backseat. See Record Document

29, Exhibit 3 ("two bags in the backseat which [Dr.] Webb stated carried her medical equipment") and 4. Defendants have also submitted the expert affidavit and report of Armbruster:

> Whether Dr. Webb gave verbal consent to not in this matter does not reduce the reasonableness of the search based on common police training which provides for searches of a movable without a warrant based on probable cause. In my opinion, the action of the officers in this situation fall well within this exception to the search warrant requirement.

Record Document 29, Exhibit 12; see also U.S. v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). At a minimum, this is an instance where the officers had a good faith belief regarding probable cause to search Dr. Webb's vehicle. See U.S. v. Antone, 753 F.2d 1301, 1304 (5th Cir. 1985) (citations omitted) ("The probable cause issue must be analyzed under the 'totality of the circumstances' as to whether there is a 'fair probability' that a crime is occurring. The probable cause requirement does 'not demand any showing that such a belief is correct or more likely true than false.'"). The law is clear that "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to [qualified] immunity." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 536 (1991).[14]

Therefore, based on the totality of the circumstances, the Court finds that the search of Dr. Webb's vehicle was reasonable. Defendants are entitled to qualified immunity and

---

[14]"If an officer has **arguable** probable cause . . ., he is entitled to qualified immunity. In sum, an officer's entitlement to qualified immunity based on probable cause is difficult for a plaintiff to disturb." Gliatta v. Jones, No. 03-60079, 2004 WL 1114469, **3 (5th Cir. May 10, 2004).

summary judgment is, therefore, **GRANTED** in their favor as to Dr. Webb's unreasonable search claim.

## IV.  Claims Against Sheriff Arbuckle.

Under Section 1983, supervisory officials such as Sheriff Arbuckle are not liable for the actions of subordinates on any theory of vicarious liability. See Thompkins v. Belt, 828 F.2d 298, 303-304 (5th Cir. 1987); Thibodeaux v. Arceneaux, 768 F.2d 737, 739 (5th Cir.1985) (per curiam); Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292 (1986). However, a supervisor may be held liable if there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. See Harvey v. Andrist, 754 F.2d 569, 572 (5th Cir. 1985).

It is undisputed that Sheriff Arbuckle was not personally involved in the April 2008 "sign detail" operation at I-49 and Asseff Road. See Record Document 29, Exhibit 13. Likewise, he was not personally involved in the stop of Dr. Webb's vehicle nor the search of her vehicle. See id.

In opposing the Motion for Summary Judgment, Dr. Webb clarified her claim against Sheriff Arbuckle. Specifically, she stated:

> Sheriff[] Arbuckle's liability is based upon his independent fault in sanctioning the sign detail as a "law enforcement" operation of his office. Sheriff Arbuckle is liable under the official policy doctrine.

Record Document 34 at 9. Earlier in this ruling, the undersigned held that the "sign detail" operation at issue in this case was constitutionally valid. Thus, Sheriff Arbuckle's official policy regarding the "sign detail" operation is likewise constitutional and he is entitled to

summary judgment in his favor as a matter of law.[15]

## CONCLUSION

Based on the foregoing, the Court finds that the "sign detail" operation at issue in this case is constitutional; that the initial traffic stop of Dr. Webb was constitutional; that Defendants are entitled to qualified immunity as to Dr. Webb's prolonged detention and unreasonable search claims; and that Sheriff Arbuckle's policy relating to the "sign detail" operation is constitutional. Accordingly, the Motion for Summary Judgment (Record Document 29) filed by Sheriff Arbuckle, Corporal Pharris, and Sergeant White be and is hereby **GRANTED**. All of Dr. Webb's claims against these defendants are **DISMISSED**.

---

[15]Dr. Webb also alleges "that the actions of defendants . . . constitute fault pursuant to Louisiana Civil Code Article 2315." Record Document 1 at ¶ 56. The state law claims against Sheriff Arbuckle, Sergeant White, and Corporal Pharris are not fully briefed in the pending defense motion for summary judgment. Additionally, this case is not currently set for trial, as it was removed from the undersigned's trial docket in order to resolve the pending motions for summary judgment. See Record Document 37.

For these reasons, the Court declines to exercise its supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3); Certain Underwriters at Lloyd's, London v. Warrantech Corp., 461 F.3d 568, 578 (5th Cir.2006) (holding that "it is our 'general rule' that courts should decline supplemental jurisdiction when all federal claims are dismissed or otherwise eliminated from a case"). Therefore, all state law claims are dismissed without prejudice.

   An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

   **THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 18th day of March, 2011.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE